**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **TROY MAGEE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **CIVIL NO. 05-0633-WS-M** |
| | ) |
| **CITY OF DAPHNE**, *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

**ORDER**

        This matter is before the Court on defendant's Motion for Summary Judgment (doc. 38). The Motion has been briefed and is now ripe for disposition.[1]

**I.     Background.**

        **A.      *Nature of the Case.***

        On October 31, 2005, plaintiff Troy Magee filed this action under 42 U.S.C. § 1983 against defendants City of Daphne, Chief David Carpenter, Officer Reginald Ardis, and Officer Jim Rivers, with the individual defendants being named in both their individual and their official capacities.  The Complaint (doc. 1) alleges that defendants violated Magee's constitutional rights under the First, Fourth, Fifth, and Fourteenth Amendments by perpetrating "a vicious and cruel act of police brutality" against him at his home during the early morning hours of November 4, 2003.  (Complaint, ¶ 1.)  Based on that incident, the Complaint propounds no fewer than ten (10) causes of action, to-wit: (i) a claim against Officer Ardis and Officer Rivers for conspiracy to deprive plaintiff of his constitutional rights, in violation of § 1983; (ii) a § 1983 claim against Officers Ardis and Rivers for unreasonable and excessive force; (iii) a § 1983 claim against Officers Ardis and Rivers for false arrest and false imprisonment; (iv) a § 1983 claim against the City and Chief Carpenter for gross negligence, deliberate indifference or intentional misconduct which directly caused the constitutional deprivations; (v) a state-law claim against the City and

---

        [1]     Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically.  However, it has been entered only to decide the motion or matter addressed herein and is not intended for official publication or to serve as precedent.

Chief Carpenter for gross negligence and negligence; (vi) a state-law claim against all defendants for assault and/or battery;[2] (vii) a state-law claim against all defendants except Chief Carpenter for false arrest and false imprisonment; (viii) a state-law claim against Officers Ardis and Rivers for intentional and negligent infliction of emotional distress; (ix) a state-law claim against Officers Ardis and Rivers for unspecified "intentional tort"; and (x) a state-law claim against the City for respondeat superior.[3]

### B.      Facts.[4]

On the evening of November 3, 2003,[5] Magee and his girlfriend, non-party Kim Irvin, attended a concert in Pensacola with two of their friends.  (Magee Dep., at 34.)  Before and during the event, both Magee and Irvin consumed alcoholic beverages, with Magee drinking approximately five beers and Irvin consuming approximately 15 beers.  (*Id.* at 42-46.)  After the concert, the group drove to Magee's house in the Lake Forest subdivision of Daphne, Alabama, arriving there at around midnight.  (*Id.* at 53.)  At that time, Irvin, who had alternately been passed out and physically violent toward Magee during the drive home, chased Magee around his front yard.  (*Id.* at 53-60.)  Eventually, Irvin stumbled to her car (which was parked in Magee's driveway) and sped away.  (*Id.* at 61, 63; Elmore Aff., at 2.)  Magee promptly called the Daphne Police Department anonymously and informed them, "there is a girl in green Saturn

---

[2]      The caption of this cause of action reads "Assault," but the body references "atrocious acts of battery."  (Complaint, ¶ 41.)  It is therefore unclear whether plaintiff seeks to plead one or both theories.

[3]      Because of a numbering error, the Complaint captions the respondeat superior claim as "Count Twelve" and similarly mis-numbers several other causes of action by skipping counts four and nine.  It is clear, however, the Complaint is confined to these ten causes of action.

[4]      The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party.  *See Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004); *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1217 (11th Cir. 2005).  Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in his favor.

[5]      Plaintiff's brief repeatedly identifies the relevant timeframe as November 2004, not November 2003.  (Plaintiff's Brief, at 2, 5, 7.)  Review of the summary judgment record confirms that these events transpired in November 2003.

probably driving at a high rate of speed," after which he hung up. (Magee Dep., at 63, 66.) According to Magee, he placed this call out of concern that Irvin was "going to kill someone or hurt someone" by driving in her intoxicated and irrational state. (*Id.* at 63.) At that point, the two friends left, and Magee took a shower and went to bed. (*Id.* at 66.)[6]

At around the same time that Magee called the police, nonparty Daphne Police Officer David Smith stopped a Saturn heading eastbound on U.S. Highway 98 at the entrance to the Rock Creek subdivision, traveling at a high rate of speed. (Smith Aff., at 1.) The driver, Irvin, was crying hysterically. (*Id.* at 1.) Irvin advised Officer Smith that she was trying to get away from her boyfriend, Magee, "who had been beating her for the past several hours." (*Id.* at 1-2.) Irvin further informed Officer Smith that, after an argument over cocaine, Magee had pulled her hair, "dragging her up and down the driveway." (*Id.* at 2.) Officer Smith observed that Irvin's physical condition was consistent with this narrative of physical abuse, given the presence of "large abrasions on her back and elbows" and "large amounts of loose hair all over her," including "bald spots on her head where hair had been pulled out." (*Id.*) Irvin also advised Officer Smith that Magee "had been doing Cocaine and had been drinking alcohol earlier in the evening" at the concert in Pensacola. (*Id.*) Officer Smith arranged for a friend of Irvin's named Andrea Holloway to pick her up. (Holloway Dep., at 8.) When Holloway arrived at the scene, Officer Smith informed her that "they were getting Troy Magee" and that "we know his reputation and we've been trying to catch this one for a long time." (*Id.* at 9.) Despite the fact that Irvin was "slurring her words" and "reeked of alcohol," she was not cited or charged. (*Id.* at 21.)

Officer Smith was unable to travel to Magee's residence immediately because he needed

---

[6]    The parties devote considerable attention in their briefs to describing the specifics of how events had unfolded to this point, such as whether Magee had in fact been physically abusive towards Irvin and how the two of them had interacted that night. But this lawsuit is confined to the legality of Daphne police officers' conduct after these events took place. As such, factual details concerning events preceding Magee's phone call to the police are largely irrelevant. The critical inquiries for summary judgment purposes are what the involved officers knew, what they observed, and what they had reason to believe. To the extent that the events from earlier in the evening diverged from, or were outside the scope of, information in the officers' possession when they were dispatched to Magee's home on suspicion of domestic violence, those events are not pertinent to the legal issues presented on summary judgment.

to photograph Irvin and obtain a written statement from her.  (Plaintiff's Exh. 2.)  However, based on his interaction with Irvin, Officer Smith contacted Officers Ardis and Rivers by radio at approximately 1:00 a.m. and told them "that Ms. Irvin had been assaulted by Mr. Magee and that he had established probable cause to arrest Mr. Magee for domestic violence 3rd."  (Rivers Aff., at 1; *see also* Ardis Dep., at 34.)   Officer Smith requested that Officer Ardis "go to [plaintiff's] residence and attempt to interview Mr. Magee and potentially make an arrest for the alleged crime." (Ardis Dep., at 32.)  Thus, Officer Ardis's understanding was that he was "[n]ot 100 percent" to arrest Magee, that he would not "have arrested him on-site [*sic*] without any conversation with him," and that his initial objective was to interview Magee. (*Id.* at 35.)[7]

Although Officers Ardis and Rivers were on routine patrol in separate vehicles, both arrived at Magee's residence at approximately 1:08 a.m. (Ardis Dep., at 18, 32, 39; Rivers Aff., at 1.)[8]  Neither Officer had personally interviewed or seen Irvin before traveling to Magee's residence.  (Ardis Dep., at 54.)  Officers Ardis and Rivers parked their cars, approached the residence on foot, and knocked on the front door.  (*Id.* at 39-40.)  The only visible light coming from the house was an illuminated, covered window in a room to the left of the door.  (*Id.* at 40; Rivers Aff., at 1-2.)  All of the lights in the house were off except for a bathroom light, with the

---

[7]     Officer Ardis's testimony is not entirely consistent with that of Officer Smith and Officer Rivers on this point.  According to the latter two, Officer Smith requested that Officers Ardis and Rivers proceed to Magee's residence in Daphne and arrest him for domestic violence. (Rivers Aff., at 1; Smith Aff., at 2.)  But Officer Ardis framed the assignment as being to interview Magee and make a decision whether or not to arrest him based on information acquired during that process.  For summary judgment purposes, the evidence is taken in the light most favorable to plaintiff; therefore, the Court will accept as true Officer Ardis's account on this point.

[8]     With regard to Officer Ardis, plaintiff repeatedly references his testimony in a "Municipal Transcript, dated Feb. 3rd, 2004." (Plaintiff's Brief, at 5-7.)  That transcript is not part of the Rule 56 record, and therefore cannot be considered on summary judgment.  Similarly, both parties' briefs (including particularly defendants' Reply Brief) include citations to deposition pages that they have failed to include in the record.  The Court can only assess the Rule 56 issues based on the record the parties have provided, and it is their responsibility to ensure that all deposition excerpts and other exhibits cited in their briefs are actually furnished to the Court.  To the extent that such excerpts and exhibits have been omitted, the Court cannot and will not consider the allegations set forth in the parties' briefs that cite to such missing documents.

door to that room barely shut. (Magee Dep., at 70.) Magee, who had been sleeping, awakened and came to the door, clad only in boxer shorts. (*Id.*) The Officers observed that Magee appeared to be "extremely intoxicated and very agitated." (Rivers Aff., at 2.) Magee did not turn on any lights; thus, the room behind him was dark, and the front porch was dark, with the only light coming from the Officers' flashlights and a distant streetlight. (*Id.*)[9] In any event, Magee came to the door, opened it, and saw Officers Ardis and Rivers standing at the foot of the steps, directly in front of him. (Magee Dep., at 70, 76.) The Officers told him, "we have come here to investigate an incident that just happened." (*Id.*) When Magee professed ignorance, they indicated that Irvin had been pulled over for speeding and requested that he step outside. (*Id.* at 70-71.) Magee replied, "I would rather sit here in the doorway and discuss this." (*Id.* at 71.) At some point, Magee told the Officers that he had done nothing wrong with respect to Irvin. (Magee Aff., ¶ 10.)

During this discussion, Magee opened the glass storm door separating him from the Officers, ostensibly because he "wanted to get closer to them." (Magee Dep., at 72, 75.) At that point, Magee's right hand was in the upper right-hand corner of the doorway on the door (which opened in), with his left hand holding open the storm door (which opened out). (*Id.* at 75; Magee Aff., ¶¶ 3, 4.)[10] Magee testified that, after opening this door, he "was standing there in plain view" and he "wasn't hiding around the side of the door or didn't have the latch on it." (Magee Dep., at 75-76.) The Officers repeatedly asked and then instructed him to step outside to discuss the matter. When Magee refused these repeated requests and directives, the Officers said, "Well, if you don't come outside you are under arrest for domestic violence." (*Id.* at 71.)

---

[9]    In an undated summary judgment affidavit, Magee cryptically stated, "My light over my front door provided light for my porch." (Magee Aff., ¶ 5.) But he did not aver that the light was actually switched on at this point, and his deposition testimony was that the only illuminated light in the house came from a bathroom.

[10]    In his affidavit, Magee averred that his hands "were exposed and open to the Officers at the time they were interviewing me from the door. They could clearly see that I had no weapons on me." (Magee Aff., ¶ 4.) Magee's speculation about what the Officers saw will not be credited on summary judgment because the affiant has shown no basis for personal knowledge as to what the Officers could or could not "clearly see" from the darkened porch as he stood inside the doorway.

When Magee replied "there hasn't been any," the Officers screamed at him, pulled out their taser guns, and threatened to tase him unless he came outside. (*Id.* at 71-72.) Magee reiterated that he was going to stand in his doorway, that he was not coming outside, and that they could discuss the matter in a normal manner if the Officers would lower their voices. (*Id.* at 79.) The Officers then commanded Magee "to come outside, you are under arrest for domestic violence." (*Id.* at 76.)[11] Magee responded, "I will sit here and discuss this with you. I'm not coming outside my doorway. It's cold out." (*Id.*) Officer Ardis then shot Magee with his taser gun as Magee stood inside his house in his boxer shorts holding his door open. (*Id.*)[12] When Magee bent over and asked why the Officers had tased him, he felt another taser shot. (Magee Aff., ¶ 8; Magee Dep., at 83.) Both times he was tased in the chest area. (*Id.*) Somehow Magee removed the taser darts from his flesh and closed and locked the front door. (*Id.*; Magee Aff., ¶ 9.) The Officers began beating on the door. (Magee Dep., at 83, 86.) Bloodied and, in his words, "freaking out," Magee ran through the house, hurdled the hot tub, raced out the back door "and proceeed[ed] over on in fear of my life." (*Id.* at 83, 86.) He hid in the woods behind his house "in great fear," and remained concealed there until the Officers departed. (Magee Aff., ¶ 9.)

Officers Ardis and Rivers offer a differing account of their interactions with Magee. Of course, these defendants' narratives cannot be considered on summary judgment to the extent they conflict with plaintiff's. Nonetheless, several aspects of the Officers' testimony are consistent with and/or uncontradicted by Magee's evidence, and therefore are properly before the Court. The Officers observed that Magee appeared intoxicated. (Ardis Dep., at 96.) Notwithstanding Magee's protestations that he had done nothing wrong, Officer Ardis "perceived some animosity" towards Irvin on Magee's part. (*Id.* at 72.) In requesting and later

---

[11]     This evidence is consistent with Magee's affidavit, in which he averred that he refused to come outside his doorway, after which "I was then told that I was under arrest, and that I would be tased if I did not come outside." (Magee Aff., ¶ 6.)

[12]     A taser gun "is a Conducted Energy Weapon that uses propelled wire to conduct energy to a remote target, thereby controlling and overriding the body's central nervous system. The taser gun fires two probes up to a distance of twenty-one feet from a replaceable cartridge. These probes are connected to the taser gun by high-voltage insulated wire. When the probes make contact with the target, the taser gun transmits electrical pulses along the wires and into the body of the target." *Draper v. Reynolds*, 369 F.3d 1270, 1273 n.3 (11th Cir. 2004).

ordering Magee to come outside, Officers Ardis and Rivers were proceeding out of concern for their own safety.  (*Id.* at 61; Rivers Aff., at 2.)  Officer Rivers observed that Magee "seemed to get more agitated as we asked questions, and would not step out of the front door."  (Rivers Aff., at 2.)  Officer Rivers further agrees that Magee was specifically commanded to step outside the residence because he was under arrest for domestic violence, but that Magee refused to do so.  (*Id.*)  Magee was warned that he would be tased if he did not comply.  (*Id.*)  Magee did not comply, which the Officers viewed as illegal conduct, to-wit: refusal to comply with a lawful order to exit the house to participate in an interview concerning an alleged criminal act.  (Ardis Dep., at 90.)  The Officers ultimately used their tasers "to prevent a physical altercation between the subject and the officers."  (Rivers Aff., at 2.)  The intended effect of the taser was to cause Magee to fall to the ground, enabling the Officers to handcuff him without further incident.  (Ardis Dep., at 114.)  He was tased twice, but the tasers had no apparent physiological debilitating effects.  (*Id.*; Rivers Aff., at 114.)  Apparently, one taser shot malfunctioned because one of the darts missed Magee, and the other taser shot failed because Magee slammed the door immediately after being hit, severing the wires.  (Ardis Dep., at 118; Plaintiff's Exh. 2.)

It is undisputed that Magee did not lunge towards the Officers and did not directly threaten them, but that the Officers perceived him to be argumentative and uncooperative, intoxicated, and having an extremely aggravated demeanor.  (Ardis Dep., at 71-72, 97.)[13]  Based on all of the surrounding facts and circumstances, as well as his experience in dealing with uncooperative suspects, Officer Ardis perceived the situation to be "threatening compared with similar interviews, similar investigations [he] had conducted in the past."  (*Id.* at 71.)

## II.   Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The

---

[13]     Contrary to the Officers' testimony, Magee states that he neither "bald up" his fists nor cursed at them.  (Magee Aff., ¶ 10.)  That evidence will be considered in the light most favorable to plaintiff.  Magee also denies that he was "acting agitated" (*id.*), but that determination is in the eyes of a beholder.  Magee cannot testify as to whether the Officers harbored a reasonable <u>perception</u> that he was, in fact, acting agitated, and it is that perception that is germane to the issues on summary judgment.

party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. *Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004).

**III.    Analysis.**

As mentioned *supra*, Magee's expansive pleading derives ten (10) separate claims for relief from these relatively straightforward facts, including both federal and state-law causes of action. Defendants now seek summary judgment on this welter of theories of liability.

> **A.    *Federal Claims against Officers Ardis and Rivers (Counts I - III).***

The Complaint alleges that Officers Ardis and Rivers are liable for a conspiracy to deprive plaintiff of his constitutional rights (Count I); deprivation of plaintiff's constitutional right to be free from excessive and unreasonable force (Count II); and deprivation of plaintiff's constitutional right to be free from false arrest and false imprisonment (Count III), all in violation of 42 U.S.C. § 1983.

> *1.    Section 1983 Conspiracy Claim.*

The Complaint alleges that Officers Ardis and Rivers "under color of law, conspired with one another to deprive Mr. Magee of his constitutional rights," and that in furtherance of this conspiracy, they physically assaulted Magee, falsely arrested and imprisoned him, fabricated criminal charges against him, and submitted false police reports, statements and testimony to

corroborate those fabricated charges.  (Complaint, ¶¶ 22-24.)  The law is clear that "[c]onspiring to violate another person's constitutional rights violates section 1983."  *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1283 (11th Cir. 2002).  To establish a *prima facie* case of a § 1983 conspiracy, a plaintiff must demonstrate that the defendants "reached an understanding to violate his rights."  *Id.* (citation omitted).

Magee's conspiracy cause of action asserts that Officers Ardis and Rivers conspired with each other (and no one else) to infringe upon his constitutional rights.  This allegation is insufficient, as a matter of law, to state a cognizable claim because Officers Ardis and Rivers were both on-duty police officers for the City during the incident in question.  The Eleventh Circuit has embraced the intracorporate conspiracy doctrine, under which "acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy.  Simply put, under the doctrine, a corporation['s] ... employees, when acting in the scope of their employment, cannot conspire among themselves."  *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (en banc).  "The doctrine applies to public entities such as the City and its personnel."  *Denney v. City of Albany*, 247 F.3d 1172, 1190 (11th Cir. 2001); *see also Dickerson v. Alachua County Com'n*, 200 F.3d 761, 768 (11th Cir. 2000) (rejecting conspiracy claim because "the County jail and its employees are considered to constitute a single legal entity that cannot conspire with itself").  Thus, defendants argue that they are entitled to summary judgment on the § 1983 conspiracy claim because Officers Ardis and Rivers were both acting within the scope of their employment with the City on the night in question, such that it was a legal impossibility for them to conspire between themselves because there was no multiplicity of actors.

In response to this challenge, plaintiff says nothing.  Given this silence and the absence of any apparent factual or legal basis in the record for concluding that the doctrine would not apply here, Magee's § 1983 conspiracy claim is properly dismissed.  As on-duty police officers for the City of Daphne acting within the scope of their employment, Officers Ardis and Rivers were agents of the City, constituting a single legal entity that could not possibly conspire with itself.  As such, there is no evidence of an agreement between two or more persons, which is a fundamental requirement for any conspiracy claim.  Defendants' Motion for Summary Judgment will be **granted** as to the § 1983 conspiracy count.

2.      *Qualified Immunity Legal Standard.*

Officers Ardis and Rivers contend that plaintiff's other § 1983 claims against them are barred by qualified immunity. When a government officer is sued in his individual capacity for money damages based on alleged civil rights violations, he may posit an affirmative defense of qualified immunity. *See Swint v. City of Wadley, Ala.*, 51 F.3d 988, 994 (11th Cir. 1995). The Supreme Court has held "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L. Ed.2d 396 (1982). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citations omitted). As such, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

"To be entitled to qualified immunity, the defendant must prove that he was acting within the scope of his discretionary authority" when the allegedly wrongful acts occurred. *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1303 (11th Cir. 2006). In assessing whether a defendant's challenged actions are within the scope of his discretionary authority, courts examine "whether the government employee was (a) pursuing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). The discretionary authority criterion is clearly satisfied here. The wrongs plaintiff ascribes to Officers Ardis and Rivers occurred while they were on routine patrol as City police officers, having been dispatched to plaintiff's home on suspicion of domestic violence, and in the course of attempting to interview and then arrest Magee. Such routine law enforcement functions are clearly discretionary functions for qualified immunity purposes. *See, e.g., Gray,* 458 F.3d at 1303-04 (sheriff's deputy responsible for detaining, questioning and if appropriate arresting students was engaged in discretionary function in questioning and detaining plaintiff); *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004) (sheriff's deputy who arrested plaintiff was engaged in discretionary function because making arrests fell within his official responsibilities); *Vinyard v.*

-10-

*Wilson*, 311 F.3d 1340, 1346 (11ᵗʰ Cir. 2002) (law enforcement officer clearly acts within course and scope of discretionary authority by arresting plaintiff and transporting her to jail); *Burdeshaw v. Snell*, 365 F. Supp.2d 1194, 1198 (M.D. Ala. 2005) ("An on-duty police officer making an arrest is performing a discretionary function."). There can be no legitimate question, and plaintiff does not question, that the "discretionary function" element is satisfied here.

"Once the official has established that he was engaged in a discretionary function, the plaintiff bears the burden of demonstrating that the official is not entitled to qualified immunity." *Crosby*, 394 F.3d at 1332. To prevail, the plaintiff must demonstrate that a reasonable jury could find from record evidence that the defendant "violated a clearly established constitutional right" of which a "reasonable government official would have been aware." *Chesser v. Sparks*, 248 F.3d 1117, 1122 (11ᵗʰ Cir. 2001); *see also Bennett v. Hendrix*, 423 F.3d 1247 (11ᵗʰ Cir. 2005) (same). This inquiry is two-pronged, as a court must first ask whether, viewing the evidence in the light most favorable to the plaintiff, the official's conduct violated a constitutional right. *See Harris v. Coweta County, Ga.*, 433 F.3d 807, 811 (11ᵗʰ Cir. 2005). If not, the analysis ends and qualified immunity applies. *Id.* But if the evidence could support a finding of a constitutional violation, then the court must assess "whether, at the time of the incident, every objectively reasonable police officer would have realized the acts violated already clearly established federal law." *Id.* An affirmative answer to this question precludes qualified immunity, while a negative answer clinches qualified immunity.

In determining whether a right is clearly established, the "relevant, dispositive inquiry ... is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Bashir v. Rockdale County, Ga.*, 445 F.3d 1323, 1330 (11ᵗʰ Cir. 2006) (citation omitted). In that regard, "[a] constitutional right is clearly established if controlling precedent has recognized the right in a concrete and factually defined context." *Chesser*, 248 F.3d at 1122 (citation omitted); *see also Akins v. Fulton County, Ga.*, 420 F.3d 1293, 1305 (11ᵗʰ Cir. 2005) ("A right is clearly established if, in light of already-existing law, the unlawfulness of the conduct is apparent."). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Bashir*, 445 F.3d at 1330. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of

-11-

pre-existing law the unlawfulness must be apparent." *Id.* at 1330-31 (citation omitted).

Armed with this analytical framework, the Court will assess the qualified immunity defense of Officers Ardis and Rivers with respect to the § 1983 excessive force claim and the § 1983 false arrest claim.

>           3.       *Qualified Immunity and Excessive Force Claim.*

Plaintiff's second cause of action is a § 1983 claim alleging that Officers Ardis and Rivers deprived Magee of his constitutional right to be free from excessive and unreasonable force.[14]  The Officers have moved for summary judgment as to that cause of action on the grounds that they are entitled to qualified immunity and that the facts do not support a claim of excessive force.

Claims of excessive force relating to an arrest must be analyzed under the Fourth Amendment's "reasonableness" framework. *See Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (excessive force claims are properly analyzed under Fourth Amendment when they involve arrest or investigative stop of free citizen); *Garrett v. Athens-Clarke County, Ga.*, 378 F.3d 1274, 1279 n.11 (11th Cir. 2004) (similar).  The Fourth Amendment's right to freedom from unreasonable searches and seizures plainly encompasses a right to be free from excessive force during an arrest. *See, e.g., Davis v. Williams*, 451 F.3d 759, 767 (11th Cir. 2006) ("It is clearly established that the use of excessive force in carrying out an

---

[14]       It appears that this claim is predicated on the nature and extent of the force employed by the Officers, rather than the use of force *vel non*.  To the extent that Magee would argue that the use of <u>any</u> force here (no matter how minor) was unconstitutional because there was no probable cause to arrest him, there is support for this general principle in the case law. *See Gray*, 458 F.3d at 1304 (explaining that plaintiff's excessive force claim is not independent, but is instead subsumed in illegal seizure claim, where crux of excessive force claim is that officer lacked right to detain her in the first place); *Nolin v. Isbell*, 207 F.3d 1253, 1258 (11th Cir. 2000) (recognizing cases involving arrests without probable cause in which any use of force was inappropriate).  In that event, the excessive force and false arrest claims under the Fourth Amendment would merge into a single cause of action. *See Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000).  If this is plaintiff's excessive force argument, it fails for the reasons stated *infra*, in the context of his false arrest claim.

arrest constitutes a violation of the Fourth Amendment.").[15]

The Fourth Amendment does not forbid the use of all force in connection with an arrest. Indeed, "[t]he right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Bashir*, 445 F.3d at 1332 (citing *Graham*, 490 U.S. at 396); *Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003) ("This circuit has made clear that some use of force by a police officer when making a custodial arrest is necessary and altogether lawful...."). In that regard, the Eleventh Circuit has taken pains to "stress that not every intrusion, touching, discomfort or embarrassment during an arrest is actionable as a violation of the Fourth Amendment. Some of these acts may be provably accidental or just too insignificant and thus within the range of the constitutionally reasonable." *Hicks v. Moore*, 422 F.3d 1246, 1253-54 (11th Cir. 2005). The Fourth Amendment protects people only from "unreasonable seizures," which "contemplates more than the unnecessary strike of a nightstick, sting of a bullet, or thud of a boot." *Id.* at 1253.

To determine whether the use of force is reasonable, courts examine whether officers' actions are objectively reasonable based on the surrounding facts and circumstances. *See Garrett*, 378 F.3d at 1279.[16] "Use of force must be judged on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Vinyard*, 311 F.3d at 1347 (citations omitted). This judgment requires careful balancing of the

---

[15]     Because the Fourth Amendment provides protection from both wrongful arrest and excessive force during arrest, a claim that law enforcement officers used more force than reasonably necessary to effectuate an arrest may be viable independent of the wrongful arrest claim. *See Jackson*, 206 F.3d at 1171 ("[A] claim for excessive force during a legal stop or arrest is a discrete claim.").

[16]     For purposes of an excessive force analysis, what is reasonable turns on "all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *Hicks*, 422 F.3d at 1254 (citations omitted); *see also Vinyard*, 311 F.3d at 1349 n.14 ("The border between permissible and excessive force is marked by a fact-intensive test ... [and] thus requires careful attention to the facts and circumstances of each particular case."). Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Draper*, 369 F.3d at 1278 (citation omitted).

-13-

nature and quality of the intrusion on the individual's interests, on the one hand, and the governmental interests at stake, on the other hand.  *See id.* at 1347.  Relevant factors include (1) the severity of the crime, (2) whether the suspect poses an immediate threat to law enforcement officers or others, (3) whether the suspect is actively resisting or attempting to flee from arrest, (4) the need for the application of force, (5) the relationship between the need and amount of force used, (6) the extent of any injury inflicted, and (7) whether the force was applied in good faith or maliciously and sadistically.  *See id.*; *Lee*, 284 F.3d at 1197-98.  Because this is an objective inquiry, an officer's underlying intent or motivation is irrelevant.  Indeed, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."  *Graham*, 490 U.S. at 397.

Given the inherently fact-specific nature of excessive force claims, qualified immunity applies unless either (a) a controlling and materially similar case declares the official's conduct unconstitutional, or (b) the conduct was so obviously at the core of what the Fourth Amendment prohibits that its unlawfulness should have been readily apparent to the official.  *See Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926 (11th Cir. 2000).[17]  Thus, "in an excessive force case, qualified immunity applies unless application of the standard would inevitably lead every reasonable officer ... to conclude the force was unlawful."  *Slicker v. Jackson*, 215 F.3d 1225, 1232 (11th Cir. 2005) (citation omitted); *Davis*, 451 F.3d at 767 ("An officer will be entitled to qualified immunity if his actions were objectively reasonable - that is, if a reasonable officer in the same situation would have believed that the force used was not excessive.").  Nonetheless, a defendant should be denied summary judgment on qualified immunity grounds where the evidence taken in the light most favorable to the plaintiff raises a question of fact as to whether an officer's actions constitute excessive force.  *See Lee*, 284 F.3d at 1199.

---

[17]     On the latter point, sometimes the facts of a case are "so far beyond the hazy border between excessive and acceptable force that [every objectively reasonable officer] had to know he was violating the Constitution even without caselaw on point." *Priester*, 208 F.3d at 926; *see also Gray*, 458 F.3d at 1307 ("on rare occasion we have concluded that general Fourth Amendment principles make the constitutional violation obvious," even in the absence of a controlling and materially similar case).

As described above, the Court's inquiry turns on whether a reasonable officer on the scene would have deemed the use of force excessive, based on all surrounding facts and circumstances. Viewed in the light most favorable to Magee, the record reveals the following facts germane to the excessive force claim: (1) Officers Ardis and Rivers were dispatched to Magee's home at 1:00 a.m. on the understanding that Officer Smith had developed probable cause to arrest Magee for domestic violence for alleged physical abuse of his girlfriend that night; (2) Magee's home was dark and poorly illuminated as Officers Ardis and Rivers spoke with him; (3) the Officers perceived Magee to be agitated, aggressive and under the influence of drugs and/or alcohol; (4) the Officers were concerned about their safety, given their inability to see into the house, Magee's agitated demeanor, and the physically violent nature of the allegations which had prompted their visit; (5) Magee refused the Officers' repeated requests and direct commands that he step outside the doorway to discuss the matter; (6) even after being advised that he was under arrest and ordered to step outside for handcuffing, Magee refused to do so; and (7) the Officers cautioned Magee that they had tasers, which they would use if he did not cooperate.

Faced with these circumstances, the Officers had no reasonable choice but to use physical force. They had placed Magee under arrest for domestic violence and had instructed him to come outside his house for handcuffing, but he had refused. What option other than physical force was there? The Officers could have turned around, walked away, and simply abandoned the matter. Clearly, this option was unacceptable. Our system of law enforcement depends on police officers having the ability to back up their directives with force and take a subject into custody once he is placed under arrest. It would render their authority illusory if police officers with probable cause to arrest a suspect were obliged to abandon their arrest whenever a suspect disregards lawful commands to effect the arrest. Magee had escalated the confrontation by refusing to step outside after being told he was under arrest, and the Officers could not reasonably leave him there. Obviously, then, the use of physical force was necessary. But what kind of force? Officers Ardis and Rivers could have stormed the front door of Magee's home, invading his darkened house, jeopardizing their safety (because they did not know what or who may have been lurking in the shadows behind Magee), and physically subduing a suspect whom they perceived as drunk and hostile. In this scenario, the odds of a potentially violent physical

altercation were high, and the risks to the safety of the Officers and Magee were unacceptable. That left the taser option.  Had the weapon worked properly, one shot would have temporarily incapacitated Magee, enabling his arrest to proceed smoothly with no further use of force and no threat to anyone's safety.  When the first taser did not work, the Officers reasonably deployed their second taser in an effort to prevent the situation from escalating further.

Far from being constitutionally unreasonable and excessive, the record unambiguously reflects that Officers Ardis and Rivers exercised sound judgment in utilizing their tasers under these circumstances.  After all, they were arresting Magee for a crime of violence reported just minutes earlier.[18]  Given the physical circumstances and Magee's demeanor, the Officers reasonably concluded that he posed an immediate threat.[19]  By refusing lawful commands, Magee was actively resisting arrest.[20]  There was a clear need for application of force.  The

_____

[18]       Plaintiff insists that "the underlying charge was not severe."  (Plaintiff's Brief, at 14.)  Magee was being charged with physically beating his girlfriend over a period of hours, and dragging her by her hair in such a violent manner that she bore abrasions on her back and arms, had loose hair over her clothes, and had bald spots on her head.  Make no mistake: This was a severe charge.

[19]       With a sleight of hand, plaintiff argues that he "posed no threat to the Officers." (Plaintiff's Brief, at 14.)  Again, the record does not support this characterization.  As seen through the Officers' eyes, they were at the home of an obviously intoxicated individual who was extremely agitated and who refused to comply with lawful commands to exit his home, all in poor-lighting conditions that rendered it impossible for the Officers to gauge any threats to their safety that might be lurking behind the doorway.

[20]       Plaintiff protests that he was not actively resisting arrest because he was not fleeing at that time.  (Plaintiff's Brief, at 14.)  The Officers told him that he was under arrest and commanded him to come outside to be handcuffed.  He refused.  It would defy logic and common sense to characterize this refusal as anything other than actively resisting arrest. Plaintiff makes much of Officer Ardis's testimony that failure to respond to an officer's inquiries is not in and of itself sufficient grounds for arrest and that "[a]bsent any other contributing circumstances or probable cause, I would say [Magee] was not in peril of being arrested for not answering a question."  (Ardis Dep., at 63-64.)  But this argument ignores the presence of precisely such other contributing circumstances or probable cause here.  Officers Ardis and Rivers knew that Officer Smith had developed probable cause to arrest Magee for domestic violence.  They came to the residence to investigate further and, if appropriate, effectuate an arrest.  If anything, Magee's conduct and demeanor in their presence reinforced the need for an arrest on the underlying charge.  The Officers did not arrest Magee for failing to answer a question.  They arrested him based on the totality of the circumstances, of which only one

nature and severity of the force used was reasonably calculated to effect the arrest while minimizing risks of physical injury to the suspect or the Officers.  There is no indication that Magee sustained anything more than superficial, ephemeral injuries from the encounter; indeed, moments after being tased, he was able to slam the door, vault over a hot tub, sprint out the back door and vanish in the woods, suggesting no serious physical impairment brought on by the devices.  And there is absolutely no reason to believe that Officers Ardis and Rivers were proceeding in bad faith, maliciously, or sadistically.  Given these circumstances, and construing the facts in the light most favorable to plaintiff, no reasonable law enforcement officer on the scene could have concluded that the Officers used excessive force.  Accordingly, Officers Ardis and Rivers are entitled to qualified immunity on the § 1983 excessive force claim because the facts in the light most favorable to the non-movant do not show a Fourth Amendment violation in their application of force to effect Magee's arrest.[21]

        *4.       Qualified Immunity and False Arrest Claim.*

Count III of the Complaint alleges that Officers Ardis and Rivers "deprived Mr. Magee of his constitutional right to be free from false arrest and false imprisonment."  (Complaint, ¶ 29.)  Defendants maintain that Count III must fail because there was actual probable cause for the arrest and, in any event, the Officers were protected by qualified immunity from any liability on a Fourth Amendment wrongful arrest theory.

---

component was his steadfast refusal to step outside in a manner where the Officers could discuss the matter with him in a manner that was reasonably protective of their safety.

[21]     A helpful analogy may be drawn to *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004).  The facts in *Draper* concerned a difficult, tense traffic stop in which the suspect was belligerent, appeared excited, and spoke loudly.  When the officer repeatedly instructed the driver to retrieve copies of various papers from his tractor trailer truck, the suspect angrily refused.  Without warning, the officer discharged his taser into the suspect's chest, causing the suspect to fall to the ground.  The Eleventh Circuit affirmed the lower court's summary judgment finding of no excessive force.  According to *Draper*, under the circumstances described "use of the taser gun to effectuate the arrest ... was reasonably proportionate to the difficult, tense and uncertain situation ..., and did not constitute excessive force."  *Id.* at 1278.  The same can be said here.  The *Draper* court also observed that while "being struck by a taser gun is an unpleasant experience," it "did not inflict any serious injury" and "may well have prevented a physical struggle and serious harm to either" the officer or the suspect.  *Id.*  Again, this proposition rings equally true in the case at bar.

Probable cause for an arrest exists "when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Draper v. Reynolds*, 369 F.3d 1270, 1276 (11th Cir. 2004) (citation omitted). To be entitled to qualified immunity protection, however, "an officer need not have actual probable cause but only arguable probable cause." *Wood v. Kesler*, 323 F.3d 872, 878 (11th Cir. 2003) (citation omitted); *see also Jones v. Cannon*, 174 F.3d 1271, 1283 n.3 (11th Cir. 1999) ("Arguable probable cause, not the higher standard of actual probable cause, governs the qualified immunity inquiry.").[22] Thus, the relevant inquiry here is not whether probable cause for the arrest actually existed, but is instead the lesser threshold of whether "an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed." *Durruthy*, 351 F.3d at 1089; *see also Davis*, 451 F.3d at 762 (arguable probable cause exists "where reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest the plaintiff"). "To determine whether arguable probable cause exists, courts must look to the totality of the circumstances," construing them in the light most favorable to the nonmoving party on summary judgment. *Davis*, 451 F.3d at 763.

Under any reasonable view of the record, the Officers possessed arguable probable cause to arrest Magee for domestic violence.[23] The totality-of-the-circumstances analysis includes all

_____

[22] The justification for this reduced burden is that it would be unfair to strip law enforcement officers of qualified immunity and to subject them to liability for making reasonable, albeit mistaken, judgments as to the presence of probable cause. *See Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ("Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity.").

[23] Plaintiff would muddy the waters by arguing that the Municipal transcript reflects that the Officers arrested Magee for refusal to participate in an interview, not for domestic violence. (Plaintiff's Brief, at 7, 20.) This contention fails for three reasons. First, as stated *supra*, plaintiff omitted this exhibit from the summary judgment record, so it is not before this Court and cannot be considered. Second, Magee would apparently have the Court ignore his own deposition testimony that "As soon as I opened the screen door that's when they said to come outside, ***you are under arrest for domestic violence***." (Magee Dep., at 76 (emphasis

facts within the collective knowledge of all City officers, not just Officers Ardis and Rivers.  For that reason, information known to Officer Smith must be considered as well, even if Officers Ardis and Rivers were not expressly aware of it at the time of the arrest.[24]  At the time that Officers Ardis and Rivers informed Magee that he was under arrest for domestic violence, they and Officer Smith had actual knowledge of the following facts: (a) minutes earlier, Officer Smith had observed Irvin in a highly distraught, emotionally hysterical state; (b) Irvin informed Officer Smith that Magee had physically abused her for hours that night; (c) Irvin's physical condition was consistent with such abuse, given the visible abrasions on her body, the loose hair clumped onto her clothes, and the bald spots on her scalp from whence hair appeared to have been forcibly yanked; (d) Officers Ardis and Rivers perceived Magee to be intoxicated and aggressive, with Officer Ardis noticing that Magee seemed "very aggravated" and appeared to

---

added).)  Plaintiff does not get to pick and choose which parts of his testimony he wants the Court to accept, and which he would prefer to supplant with other, more favorable record evidence.  *See Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (*en banc*) ("When the nonmovant has testified to events, we do not (as urged by Plaintiffs' counsel) pick and choose bits from other witnesses' essentially incompatible accounts (in effect, declining to credit some of the nonmovant's own testimony) and then string together those portions of the record to form the story that we deem most helpful to the nonmovant.  Instead, when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's *version*.").  Third, Magee ignores the fact that the relevant benchmark may be satisfied if there was probable cause to arrest him for any offense, even if it is not the offense (or even closely related to the offense) identified by the arresting officers.  *See Devenpeck v. Alford*, 543 U.S. 146, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004) (rejecting notion that arrest is unlawful under Fourth Amendment if offense for which there is probable cause to arrest is not "closely related" to offense identified by arresting officer); *Lee*, 284 F.3d at 1195-96 (for purposes of arguable probable cause inquiry, it is irrelevant whether officer cited correct offense because neither officer's subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest); *United States v. Lopez-Moreno*, 420 F.3d 420, 432 (5th Cir. 2005) (even if officer was mistaken that suspect was violating particular statute, probable cause for traffic stop still existed if it was objectively reasonable to believe that suspect was violating another statute).

[24]      It is well established that "[w]here there is at least minimal communication between different officers, the collective knowledge of the officers determines probable cause." *United States v. Allison*, 953 F.2d 1346, 1350 (11th Cir. 1992); *see also Wilson v. Attaway*, 757 F.2d 1227, 1235 (11th Cir. 1985) (probable cause to arrest turns on "facts and circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy information").

harbor "animosity" towards Irvin (Ardis Dep., at 72); (e) Magee had attempted to have Irvin arrested for drunk driving;[25] and (f) Magee had been uncooperative and noncompliant with the attempts of Officers Ardis and Rivers to investigate the alleged beating of Irvin, as he stymied their questioning by refusing to come outside his house to enable the interview to be conducted safely.  Considering all of these facts, there can be no serious dispute that reasonable officers in the same circumstances and possessing the same knowledge as the Officers could have believed that probable cause existed to arrest Magee for domestic violence.[26]  As such, there is no genuine issue of material fact that Officers Ardis and Rivers had arguable probable cause to arrest Magee for domestic violence.  These Officers are therefore entitled to qualified immunity on the Fourth Amendment unlawful arrest cause of action.

### B.    Federal Claim against City and Chief Carpenter (Count IV).

The next count of the Complaint is captioned "42 U.S.C. 1983 supervisory liability" and would impose liability on defendants Chief Carpenter and the City for failing to supervise and discipline Officers Ardis and Rivers.

------------------------------------------------------------

[25]    In Officer Ardis's estimation, "you're not going to call the police to have someone you care about arrested for it unless there has been an argument or a fight, which has degraded to a certain point."  (Ardis Dep., at 72.)  This inference was reasonable.

[26]    In arguing to the contrary, plaintiff maintains that probable cause must have been lacking because "on the night in question, neither Officer Ardis nor Officer Rivers felt they had sufficient probable cause to arrest Mr. Magee upon arrival at Mr. Magee's home based on the information given to them by Officer Smith."  (Plaintiff's Brief, at 20.)  This is a distortion of the record.  Both Officers testified that Officer Smith had advised that he had probable cause to arrest Magee for domestic violence.  (Rivers Aff., at 1; Ardis Dep., at 32, 34.)  Neither Officer indicated that he did not believe the requisite probable cause to exist at the moment of their arrival at Magee's residence.  At most, Officer Ardis testified that he did not intend to arrest Magee on sight without trying to talk to him first.  (Ardis Dep., at 35.)  That statement diverges markedly from the words that plaintiff attempts to put in Officer Ardis's mouth, to-wit: that he did not feel he had sufficient probable cause to effect the domestic violence arrest at that time.  More importantly, plaintiff overlooks the well-settled notion that probable cause is an objective inquiry, as to which an officer's subjective motivations are irrelevant.  See Durruthy, 351 F.3d at 1088 n.5 ("There is no question that an officer's subjective intent is immaterial when there is an objectively reasonable basis for believing that an offense has occurred.").  Simply put, then, if probable cause existed, then it existed regardless of whether Officers Ardis or Rivers felt that it did when they first arrived at the Magee residence.

1.      *Chief Carpenter.*

It is beyond cavil that Chief Carpenter may not be held vicariously liable under § 1983 for the wrongful acts of Officers Ardis and Rivers.  *See, e.g., Gray*, 458 F.3d at 1308 ("Supervisory officials cannot be held liable under § 1983 for the unconstitutional actions of their subordinates based on respondeat superior liability."); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) ("It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability.").  Indeed, "[s]upervisors can be liable under section 1983 only if they actually participated in the allegedly wrongful act, or if a causal connection exists between their acts and the alleged violation." *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1560-61 (11th Cir. 1993).[27]  The undisputed facts show that Chief Carpenter did not personally participate in the events at issue herein; therefore, Magee's § 1983 claims against him fail unless a causal connection exists between Chief Carpenter's acts and the alleged constitutional violations perpetrated by Officers Ardis and Rivers.

The requisite causal connection can be found where either (a) "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so" or (b) "a supervisor's custom or policy results in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (citations omitted).  To be sufficient, "the deprivations must not only be widespread, they also must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Gray*, 458 F.3d at 1308 (citation omitted).  Plaintiff has come forward with no evidence of any history of widespread abuse, nor has plaintiff argued that Chief Carpenter established a custom or policy that resulted in deliberate

---

[27]      *See also McKinney v. DeKalb County, Ga.*, 997 F.2d 1440, 1443 (11th Cir. 1993) ("A supervisor can be held liable under § 1983 when a reasonable person in the supervisor's position would have known that his conduct infringed the constitutional rights of the plaintiff and his conduct was causally related to the constitutional violation committed by his subordinate.").

indifference to constitutional rights,[28] that Chief Carpenter directed Officers Ardis and Rivers to act unlawfully, or that he had any knowledge that those Officers would act unlawfully and failed to stop them.[29]  There being a dearth of evidence in the record that might support § 1983 supervisory liability against Chief Carpenter, summary judgment is due to be granted on that cause of action.

> 2.      *City of Daphne.*

A municipality may be held liable under § 1983 only if a deprivation is undertaken pursuant to a "custom" or "policy" of the city.  *See Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1307 (11th Cir. 2001); *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1479 (11th Cir. 1991). Municipal liability under § 1983 may not be grounded on *respondeat superior*.  *Quinn v. Monroe County*, 330 F.3d 1320, 1325 (11th Cir. 2003).  Stated differently, "a municipality can be liable under § 1983 only where its policies are the moving force behind the constitutional violation." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-89, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). To impose § 1983 liability on a municipality, a plaintiff must show the following: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to those rights; and (3) that the custom or policy caused the violation.  *See McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

Plaintiff does not contend that any custom or policy of the City was the moving force behind the alleged false arrest; however, he does assert that the City's policies concerning tasers and use of force were the moving force behind the alleged excessive force.  The Court having concluded as a matter of law that no reasonable law enforcement official could have concluded that the Officers used constitutionally excessive or unreasonable force, there can be no municipal

---

[28]     To be sure, plaintiff complains about the City of Daphne's policies concerning use of force, but there is no record evidence that those policies were Chief Carpenter's.  To the contrary, plaintiff's evidence is that the City, and not Chief Carpenter, approved and promulgated the relevant policies.  (Carpenter Dep., at 13; Plaintiff's Brief, at 18.)  Even if the policies could be attributed to Chief Carpenter, they are insufficient as a matter of law to establish the requisite deliberate indifference, for the reasons set forth in subsection 2, *infra*.

[29]     To the contrary, it is undisputed that no complaints of excessive force had ever been lodged against either Officer Ardis or Officer Rivers prior to the events in question. (Wilson Aff., ¶¶ 3-4.)

liability on that theory, and this cause of action must fail.  *See Grech v. Clayton County, Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003) (municipal liability under § 1983 exists only when county's official policy "causes a constitutional violation"); *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 n.13 (11th Cir. 2003) (because officer's arrest and use of force were constitutionally permissible, "there can be no policy or custom of the City that officially sanctioned or ordered a constitutional violation").

Even if plaintiff had shown a constitutional violation relating to the use of excessive force, dismissal of his § 1983 claim for municipal liability would remain warranted because he cannot show that the policy in question exhibited deliberate indifference to his constitutional rights.  Plaintiff's position is that the City's written policy on tasers (the "Taser Policy") sanctioned their excessive and disproportionate use.  In particular, plaintiff objects to the intersection of the Taser Policy with the City's Use of Force Policy.  The Use of Force Policy authorized City officers to use less lethal force to protect themselves or others from physical harm; to restrain or subdue resistant, noncompliant individuals; or to bring an unlawful situation safely and effectively under control.  (Plaintiff's Exh. 13.)  In that regard, the Use of Force Policy created a "force continuum" and directed officers to use "only that level of force on the 'Force Continuum' that is reasonably necessary to de-escalate the incident and bring it under control."  (*Id.*)  That continuum ranged from "Officer Presence" at the low end, to "Deadly Force" on the high end, with tasers ranked above "Officer Presence" and "Verbal Command", but below "O.C. Spray," "Hard Empty Hand," and others.  (*Id.*)  According to the continuum, tasers "may be used before or after Soft Empty Hand, as the situation dictates."  (*Id.*)[30]  The Use of Force Policy reflects the City's policy that officers "use only the minimum amount of force that is necessary to effectively bring an incident under control, while protecting the lives of the officer and others."  (*Id.*)

---

[30]      As one witness explained, City officers "may try to bring the person into custody with their hands or use the taser after trying the hands or use a taser before the hands, based on the perceived threat or the possibility of a threat.  They have discretion based on their training and experience and the situation that they are facing to do either/or."  (Wilson Dep., at 39.)  Plaintiff characterizes the Use of Force Policy as allowing taser use only if a person verbally refuses to submit to an arrest.  (Plaintiff's Brief, at 10.)  Of course, the record in the light most favorable to plaintiff reflects that this is precisely what transpired at the Magee residence.

All of these principles are echoed in the Taser Policy.  (Wilson Aff., at Exh. B.)  That policy specifies that tasers may be used only "to control dangerous or violent subjects when deadly physical force does not appear to be justified and/or necessary; or attempts to subdue the subject by other conventional tactics have been or will likely be, ineffective in the situation; or there is reasonable expectation that it will be unsafe for officers to approach within contact range of the subject."  (*Id.*)

By their terms, the City's policies limit taser use to certain appropriate circumstances primarily aimed at protecting the safety of both officers and arrestees.  Those same policies forbid any use of less lethal force beyond that reasonably necessary to de-escalate an incident and bring it under control.  Notwithstanding plaintiff's arguments to the contrary, the Court perceives nothing in the Use of Force Policy or the Taser Policy that officially sanctions, orders, or is deliberately indifferent to the excessive use of force with respect to tasers.  As such, those policies cannot form a viable basis for § 1983 municipal liability here.[31]

In a final effort to derive municipal liability, plaintiff suggests that the City inadequately trained its officers because the only taser training Officers Ardis and Rivers received was in March 2002, with no subsequent recertification prior to the November 2003 incident.  (Plaintiff's Exh. 16; Wilson Aff., ¶ 8.)  In certain limited circumstances, an allegation of failure to train can be a basis for liability under § 1983.  *See Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998).  Nonetheless, plaintiff's insistence that § 1983 liability may accrue to the City on grounds of inadequate training is perplexing when the undisputed evidence is that Officers Ardis and Rivers complied fully with the Taser Policy and the Use of Force Policy with their conduct towards Magee.  Chief Carpenter's uncontroverted testimony is that those Officers "followed all our procedures" during the Magee incident.  (Carpenter Dep., at 59.)  In the absence of any

---

[31]      In this respect, plaintiff's arguments hinge exclusively on an unpublished decision from the Middle District of Florida, *Maiorano ex rel. Maiorano v. Santiago*, 2006 WL 2024951 (M.D. Fla. July 15, 2006).  *Maiorano* does not bolster plaintiff's position.  To the contrary, the *Maiorano* court found no municipal liability for excessive force where the relevant use of force policy "allows for the use of a taser only in certain instances," instructs deputies "not to use any force except in very limited circumstances such as self defense or overcoming physical resistance," and "does not sanction the use of excessive force."  *Id.* at *15.  The *Maiorano* policy shares these attributes with the City of Daphne's policies here, and yields the same conclusion.

suggestion that Officers Ardis and Rivers violated City policies, no reasonable inference can be drawn that the alleged use of excessive force of which Magee complains was in any way caused by deficiencies in the depth or breadth of the Officers' training as to those policies.  This defect is fatal to § 1983 liability predicated on a failure to train theory.  *See Snow ex rel. Snow v. City of Citronelle, AL*, 420 F.3d 1262, 1271 (11th Cir. 2005) ("To hold the municipality liable, there must be a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."); *Gold*, 151 F.3d at 1350 (failure to train supports § 1983 liability only where such failure actually causes the alleged constitutional violation).  Moreover, liability for failure to train may exist only where evidence reflects "that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action."  *Gold*, 151 F.3d at 1350.  No such evidence being apparent here, this is not a cognizable basis for § 1983 municipal liability against the City of Daphne.

> ### C.        *State-Law Causes of Action.*

Having addressed all of Magee's federal causes of action, the undersigned now turns to the grab-bag of state-law claims articulated in the Complaint, consisting of the following:  a claim against the City and Chief Carpenter for gross negligence and negligence (Count V); (vi) a claim against all defendants for assault and/or battery (Count VI); (vii) a claim against all defendants except Chief Carpenter for false arrest and false imprisonment (Count VII); (viii) a claim against Officers Ardis and Rivers for intentional and negligent infliction of emotional distress (Count VIII); (ix) a claim against Officers Ardis and Rivers for unspecified "intentional tort" (Count IX); and (x) a claim against the City for respondeat superior (Count X).  Defendants contend that certain immunities and other defenses preclude these causes of action in their entirety.

Defendants first invoke a statutory immunity (otherwise known as "peace-officer immunity"), pursuant to which "[e]very peace officer, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof ... and whose duties ... include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state ... ***shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law***

*enforcement duties.*"  Ala. Code § 6-5-338(a) (emphasis added).  In enacting this statute, the Alabama legislature "intended to afford municipal law-enforcement officials the immunity enjoyed by their state counterparts." *Hollis v. City of Brighton*, --- So.2d ----, 2006 WL 2089919, *6 (Ala. July 28, 2006) (citation omitted).  Discretionary functions within the statute's ambit are "those acts as to which there is no hard and fast rule as to course of conduct that one must or must not take and those requiring exercise in judgment and choice and involving what is just and proper under the circumstances." *Id.* (citation omitted).

Notwithstanding the foregoing, Alabama courts facing a question of whether peace-officer immunity is due a municipal officer under § 6-5-338(a) now apply the restatement of State-agent immunity under Alabama common law. *See Blackwood v. City of Hanceville*, 936 So.2d 495, 504 (Ala. 2006) (explaining that "whether a qualified peace officer is due § 6-5-338(a) immunity is now judged by the restatement of State-agent immunity articulated by *Ex parte Cranman*, 792 So.2d 392 (Ala. 2000)"); *Ex parte City of Tuskegee*, 932 So.2d 895, 904-05 (Ala. 2005) ("since the *Cranman* test was adopted we analyze immunity issues under § 6-5-338(a) in terms of the principles set forth in *Cranman*").  Thus, the present state of Alabama law dictates that peace-officer immunity issues be analyzed under the common-law State-agent immunity framework, rather than under the dichotomy of ministerial versus discretionary functions. *Id.*  The Court will proceed in like fashion.[32]

Accordingly, the peace-officer immunity question turns on application of the restatement of the test for determining State-agent immunity under Alabama law.  That restatement provides, in relevant part, that "[a] State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's ... exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons." *Ex parte*

---

[32]      By contrast, the parties' briefing addresses discretionary function immunity and statutory immunity as distinct doctrines under which defendants might receive immunity on the state-law causes of action.  Alabama precedent is clear, however, there are no separate inquiries for these two types of immunity; rather, Alabama courts examine peace-officer immunity questions solely through the prism of common-law principles of State-agent immunity.

*Cranman*, 792 So.2d 392, 405 (Ala. 2000).[33]  That said, *Cranman* carves out an exception for this immunity "when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Id.*; *see also  Hollis*, ---- So.2d ----, 2006 WL 2089919, at *3 (state-agent immunity is withheld for agents who act "willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law"); *City of Tuskegee*, 932 So.2d at 906 ("Peace officers are not entitled to absolute immunity under § 6-5-338(a); rather, immunity from tort liability under § 6-5-338(a) is withheld if an officer acts with willful or malicious intent or in bad faith.").  It is the plaintiff's burden to establish this exception.  *See Howard v. City of Atmore*, 887 So.2d 201, 205 (Ala. 2003) (recognizing burden-shifting analysis for State-agent immunity defense, whereby defendant must demonstrate that claims arise from function entitling him to immunity, after which plaintiff bears burden of establishing that officer acted willfully, maliciously, fraudulently, or in bad faith, or that he was not exercising his judgment in accordance with *Cranman*).

Plaintiff makes no argument or suggestion that the prerequisites for peace-officer immunity are not present here.  In other words, there is no dispute that Officers Ardis and Rivers were municipal peace officers whose duties included enforcement of criminal laws, nor is there any question that the conduct made the basis of plaintiff's claims against them is based on their exercise of judgment in arresting or attempting to arrest persons.  As such, the Officers are entitled to peace-officer immunity under § 6-5-338(a) unless plaintiff can show that they were acting willfully, maliciously, fraudulently, in bad faith, or the like.  The sum total of plaintiff's argument in support of the exception is that Holloway testified that Officer Smith stated that "we've been trying to get [Magee] for a long time ... we know his reputation and we've been trying to catch this one for a long time"; and that there was no probable cause to arrest Magee. On this showing, no reasonable factfinder could conclude that Officers Ardis and Rivers were acting willfully, maliciously or in bad faith.  As the Court has already found, there was clearly at least arguable probable cause to arrest plaintiff.  *See Borders v. City of Huntsville*, 875 So.2d

---

[33]     *Cranman* was a plurality decision; however, its restatement of the test for determining State-agent immunity has since been unequivocally adopted by the Alabama Supreme Court.  *See, e.g., City of Tuskegee*, 932 So.2d at 903.

1168, 1179-80 (Ala. 2003) (determining that standard of "arguable probable cause" should govern application of discretionary-function immunity under § 6-5-338). The facts on the probable cause front are not symptomatic of bad faith. Moreover, the statement attributed by Holloway to Officer Smith is far too attenuated, obscure, tangential and innocuous to yield a cognizable inference of bad faith. Even if Officer Smith had been chomping at the bit to "get" Magee, that motivation does not negate the probable cause created by the obviously battered, tearful, hysterical woman before him who identified Magee as her assailant. And whatever it may say about non-party Officer Smith, the statement certainly cannot reasonably impute nefarious motives to Officers Ardis and Rivers, who did not make the statement and were not even present when it was made.[34] Plaintiff has not met his burden of establishing that the Officers' actions were malicious or taken in bad faith.

Accordingly, the Court determines that Officers Ardis and Rivers are entitled to peace-officer immunity under Ala. Code § 6-5-338 as to all state-law claims raised by plaintiff. A corollary to that finding is that the City of Daphne is also immune from such causes of action. After all, "if a municipal police officer is immune pursuant to § 6-5-338(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune." *City of Crossville v. Haynes*, 925 So.2d 944, 955 (Ala. 2005); *see also City of Tuskegee*, 932 So.2d at 910 (same); Ala. Code § 6-5-338(b) (statute extends immunity "to peace officers and governmental units or agencies authorized to appoint peace officers").[35]

The same result attaches to plaintiff's state law claims against Chief Carpenter, which are directed exclusively at his role in supervising and administering the City of Daphne Police Department. A police chief is eligible for state-agent immunity for actions taken in "exercising

---

[34] In deeming Holloway's statement insufficient to raise an inference of maliciousness or bad faith, the Court does not embrace defendants' faulty reasoning that Holloway's statement should be ignored simply because it is disputed. Reply Brief, at 13 ("The veracity of Ms. Holloway's testimony is in dispute and cannot defeat the Defendants discretionary function immunity."). To adopt defendants' logic on this point would be to proceed in derogation of the applicable Rule 56 standard.

[35] The converse is also true. *See Howard*, 887 So.2d at 211 ("On the other hand, if the statute does not shield the officer, it does not shield the city.").

-28-

his or her judgment in the administration of a department or agency of government, including ... allocating resources ... [and] hiring, firing, transferring, assigning or supervising personnel." *Cranman*, 792 So.2d at 405. These categories for immunity encompass training, as well as supervising. *Howard*, 887 So.2d at 210. Alabama courts have repeatedly deemed police chiefs immune in similar circumstances to those alleged against Chief Carpenter. *See Haynes*, 925 So.2d at 954 (police chief entitled to immunity for acts or omissions in establishment of policies and procedures for evaluation and monitoring of prisoners); *Howard*, 887 So.2d at 210 (police chief entitled to immunity for claims arising from alleged defects in training, implementing/ enforcing procedures, and handling potentially suicidal inmates). Moreover, plaintiff has neither shown nor argued that Chief Carpenter acted willfully, maliciously, fraudulently, in bad faith or beyond his authority. As such, Chief Carpenter is entitled to State-agent immunity, and summary judgment shall be entered in his favor on all state-law theories of liability. Chief Carpenter's immunity has a similarly preclusive effect on plaintiff's attempts to impose liability on the City for Chief Carpenter's acts or omissions. *See Haynes*, 925 So.2d at 956 ("Because the police chief is immune from liability for those acts or omissions, the City ... is also immune from liability for those acts or omissions.").

The application of peace-officer immunity through Ala. Code § 6-5-228, applied through the prism of State-agent immunity principles enunciated in *Cranman*, is fatal to all of plaintiff's state-law tort claims against all defendants. As such, the analysis need proceed no further with respect to Counts V through X, and the Court need not address defendants' claim-specific arguments as to false arrest, failure to train and supervise, or infliction of emotional distress.

**IV.  Conclusion.**

For all of the foregoing reasons, the Court finds that there are no genuine issues of material fact and that defendants are entitled to entry of judgment in their favor as a matter of law. As such, the Motion for Summary Judgment (doc. 38) is **granted**, and plaintiff's claims are **dismissed with prejudice**. A separate judgment will enter.

DONE and ORDERED this 20th day of December, 2006.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE